IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Respondent, <br><br> v. <br><br> LESTER PURDELL THOMPSON, JR., <br><br> Appellant, <br><br> and <br><br> JERI GATES, on behalf of the estate of Destinie Gates-Jackson, <br><br> Intervenor. | No. 85515-8-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Lester Thompson appeals from the judgment and sentence entered on a jury's verdict that convicted him of one count of murder in the second degree and further found that Thompson and the victim were intimate partners and his crime of conviction was an aggravated domestic violence offense. Thompson asserts that the trial court erred when it denied his requests for a subpoena duces tecum for certain of the victim's medical records, admitted certain evidence under ER 404(b), and imposed a term of total confinement for life without the possibility of parole under the Persistent Offender Accountability Act.[1] The trial court did not err, and therefore, we affirm.[2]

---

[1] RCW 9.94A.030(37); .570.

[2] Thompson also submitted a pro se statement of additional grounds for review. None of the grounds therein establish an entitlement to appellate relief.

FACTS

In 2013, Thompson was charged with, among other offenses, one count of assault in the second degree with a special allegation of domestic violence against an intimate partner, Destinie Gates-Jackson. Thompson later agreed to plead guilty to, among other things, the assault in the second degree charge, and his statement of defendant on plea of guilty contained the following admission:

> On November 22, 2013 in King County, Washington, I intentionally assaulted my ex-girlfriend Destinie Gates by strangulation when we were in an argument. I also knowingly restrained her movement without her consent and without lawful authority thereby substantially interfering with her liberty, and tried to get her to not report my conduct by threatening to harm her. While we were arguing I took her phone + some cash from her person without her permission. I also tried to get her not to come testify against me in a letter that I wrote on 2/25/14 in King County, Washington.[3]

He was released from confinement in September 2019.[4]

According to the probable cause affidavit later filed in this case, in April 2020, roughly seven months after Thompson's release from confinement, Kent Police Department (KPD) Officer Matthew Fisher responded to a dispatch to investigate a vehicle that had collided with a slow-moving train. Fisher located the vehicle, later identified as belonging to Gates-Jackson. He initiated a traffic stop and observed the vehicle accelerate in response. He pursued the vehicle and eventually brought it to a stop. Thompson was later identified as the driver, and after being stopped, he exited the vehicle and ran toward Fisher. In response,

---

[3] His 2015 crime of conviction was a most serious, or "strike," offense under the Persistent Offender Accountability Act and constituted his second conviction for such an offense.

[4] The trial court so found after acceptance of the State's allegation on this point, and Thompson did not dispute this fact at trial or on appeal.

Fisher drew his taser, fired and hit Thompson with a dart, and took him into custody.

Thereafter, KPD Officer Lovai Hong looked through one of the vehicle windows and noticed a woman lying face down along its back seat. The officers unsuccessfully attempted to rouse her. She was removed from the car, further law enforcement and paramedic attempts at reviving her were unsuccessful, and she was pronounced dead. She was later identified as Gates-Jackson.

The officers, who were equipped with body-worn video cameras, noticed significant bruising and swelling to Gates-Jackson's eyes, face, and mouth and small horizontal cuts on her neck. They also noticed dried blood throughout the vehicle's driver- and passenger-side front compartment and back seat where she was found lying face down. A King County medical examiner later observed bruising and swelling to her face, mouth, and eyes, as well as significant bilateral hemorrhaging in her neck and petechial hemorrhaging in her eyes and lips, and determined that her cause of death was asphyxiation by strangulation.

On April 28, 2020, the State charged Thompson with one count of murder in the second degree, designated as a crime of domestic violence.[5] It further alleged the aggravating circumstance that the crime was "part of an ongoing pattern of psychological, physical or sexual abuse of multiple victims manifested by multiple incidents over a prolonged period of time."[6]

During pretrial proceedings, Thompson indicated that his defense was general denial and he intended to call Dr. Carl Wigren, a forensic pathologist, who

---

[5] RCW 9A.32.050(1)(b); RCW 10.99.020; former RCW 26.50.010(7) (2019).
[6] In 2007, Thompson was convicted of assaults of victims other than Gates-Jackson.

- 3 -

would testify that Gates-Jackson died of natural causes, not by strangulation. To support such testimony, on January 3, 2022, Thompson moved for the issuance of a subpoena duces tecum (SDT) to disclose to him and his expert ten years of Gates-Jackson's medical records from five different hospitals. In response, Jeri Gates, Gates-Jackson's mother, sought leave to intervene in the prosecution in a limited capacity on behalf of the Estate of Destinie Gates-Jackson in order to oppose Thompson's motion and seek a protective order. The court granted Gates' request and, following briefing and argument, denied Thompson's motion and issued a protective order on January 28.

On November 17, Thompson filed a second motion requesting a subpoena for Gates-Jackson's records from an endocrine medical center. Following additional briefing and argument, the court also denied that motion.

The State later moved to admit certain evidence pursuant to ER 404(b) for the purpose of showing Thompson's motive to kill Gates-Jackson, specifically, evidence of his 2015 statement of defendant on plea of guilty entered in the prior case premised on his strangulation of Gates-Jackson and of his incarceration between 2013 and 2019.[7] The trial court ruled that such evidence was admissible as evidence of motive.[8] Thompson and the State later submitted proposed ER 404(b) limiting instructions to the court.

---

[7] The State also sought to introduce evidence of the plea statement for the purpose of showing an absence of accident or mistake in order to rebut Thompson's proposed defense that Gates-Jackson died of natural causes.

[8] The court reserved ruling on whether evidence of the plea agreement was admissible as evidence of an absence of accident or mistake until after Thompson's expert testified at trial.

The court granted Thompson's motion to bifurcate the trial with regard to the pattern of abuse aggravator, and a 10-day trial later commenced. In the first part of the trial, following opening statements but before the State called its first witness to testify, the trial court instructed the jury that it was to consider evidence admitted at trial regarding a 2013 incident between Thompson and Gates-Jackson only for the purpose of deciding whether Thompson had a motive to kill Gates-Jackson.[9]

The State began its case-in-chief and presented numerous witnesses and exhibits, and Thompson presented a forensic pathologist in his defense, Wigren, who testified that Gates-Jackson died of natural causes.[10] The court then issued its jury instructions, including an ER 404(b) limiting instruction regarding the 2013 incident.[11]

The next day, the jury returned a verdict convicting Thompson as charged on the base crime of murder in the second degree. That same day, the second part of the bifurcated trial commenced on the questions of whether Thompson and Gates-Jackson were intimate partners for purposes of the domestic violence designation and if Thompson's crime of conviction was part of a pattern of abuse.

---

[9] The court instructed that
Certain evidence may be admitted in this trial for a limited purpose. This evidence consists of testimony and/or exhibits regarding a 2013 incident involving Mr. Thompson and Ms. Gates-Jackson. This evidence may be considered by you only for the purpose of deciding whether the Defendant had a motive to kill Ms. Gates-Jackson. You may not consider it for any other purpose. Any discussion of this evidence during your deliberations must be consistent with this limitation.

[10] In a colloquy following Thompson's expert witness's testimony, the court ruled that it would allow the jury to consider the 2013 incident for the purpose of showing an absence of accident or mistake in Gates-Jackson's death.

[11] The court's instruction added that the jury may consider the evidence regarding the 2013 incident "for the purpose of deciding whether Ms. Gates-Jackson died of accident or mistake."

The jury returned verdicts answering "Yes" to both inquiries. The crime of conviction was a "most serious offense" ("strike") under the Persistent Offender Accountability Act (POAA), and his third such conviction.

In his sentencing memorandum filed in the trial court, Thompson argued that sentencing him to a term of total confinement of life in prison without the possibility of parole (LWOP) under the POAA was unconstitutional. At the sentencing hearing, the court considered and rejected his arguments, found that he has been convicted of three strike offenses and, pursuant to the mandate of the POAA, sentenced him to a term of confinement of LWOP.[12] The court later entered written orders regarding its ER 404(b) rulings and those regarding the POAA and Thompson's sentence.

Thompson timely appealed.[13]

ANALYSIS

I.      Denial of Motions for Subpoena Duces Tecum Was Proper

Thompson first asserts that the trial court erroneously denied his CrR 4.7(e) motions for an SDT to compel disclosure of certain of Gates-Jackson's medical records. The court did not err.

We review a trial court's management of discovery, such as its decision on a motion to issue an SDT, for abuse of discretion. *State v. Putman*, 21 Wn. App.

_____

[12] The court also noted that even if the POAA did not limit its sentencing discretion, given the jury's additional findings in this case, it would have imposed a term of LWOP.

[13] While on appeal, Gates filed a motion to intervene in the appeal in the same capacity as she had appeared in the trial court. A commissioner of this court granted her motion, Thompson filed a petition for review of the commissioner's order, and our Supreme Court granted review and affirmed the order, allowing Gates to intervene on appeal solely on the issue of whether the trial court erred when it denied Thompson's motions to subpoena Gates-Jackson's medical records. *State v. Thompson*, 5 Wn.3d 322, 326-27, 335, 574 P.3d 542 (2025).

2d 36, 48, 504 P.3d 868 (2022). "A trial court abuses its discretion when its decision is based on an untenable evidentiary or legal basis." *Id.*

Our Supreme Court has instructed that a "defendant's discovery request under CrR 4.7(e)(1) must meet two threshold requirements before the court may exercise its discretion in granting the request: (1) the information sought must be material, and (2) the discovery request must be reasonable." *State v. Norby*, 122 Wn.2d 258, 266, 858 P.2d 210 (1993). As a threshold matter, "'[t]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial . . . does not establish "materiality" in the constitutional sense.'" *State v. Blackwell*, 120 Wn.2d 822, 828, 845 P.2d 1017 (1993) (alterations in original) (quoting *State v. Mak*, 105 Wn.2d 697, 704-05, 718 P.2d 407 (1986)). "A defendant must advance some factual predicate which makes it reasonably likely the requested file will bear information material to [their] defense. A bare assertion that a document 'might' bear such fruit is insufficient." *Id.* at 830. Furthermore, "[e]vidence is material only if there is a reasonable probability that it would impact the outcome of the trial. A reasonable probability is probability sufficient to undermine confidence in the outcome." *State v. Gregory*, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006) (citation omitted).

Here, during the discovery phase prior to trial, Thompson twice sought the issuance of an SDT that ordered the disclosure of certain of Gates-Jackson's medical records. The basis for both of his requests was that the records he sought were material to his defense theory that her death resulted from natural causes, rather than strangulation. As explained *infra*, the trial court did not err when it

determined that Thompson had not carried his burden to establish that the medical records he sought were material to his defense.[14]

### A.     January 2022 Motion

Thompson's January 3, 2022 motion sought 10 years of Gates-Jackson's medical records from five different hospitals where she might have received medical treatment.[15]  Thompson's basis for the request was that "two experts have observed physical anomalies in the deceased that are consistent with a natural cause of death" and such records were "necessary to refine and support the defense experts' conclusions about Ms. Gates-Jackson's cause of death."  In support of his motion, Thompson provided a declaration from Wigren, who noted that Gates-Jackson had blood clots, blood in her lungs, and abnormal lung lobe size, opined that she "*may* have died of natural causes due to the formation of pulmonary platelet fibrin microthrombi or another similar medical condition," and stated that he was inclined to survey her medical records in order to determine "the medications she was taking, the symptoms she experienced, and diagnoses of ailments that *may* relate to her death."  (Emphasis added.)

---

[14] Because we affirm the trial court's determination on the basis of its materiality rulings, we need not address its rulings regarding reasonableness.  *See Norby*, 122 Wn.2d at 266.

[15] This was so, according to Thompson's trial counsel, because "the defense [wa]s unaware of which hospitals were visited by Ms. Gates-Jackson or how often she sought medical care."  In seeking "specific medical records" belonging to Gates-Jackson, his motion argued that

> Dr. Wigren does not need to review records that are unrelated to the potential cause of Ms. Gates-Jackson's death.  Dr. Wigren requires only those medical records that include information about Ms. Gates-Jackson's underlying medical conditions, excluding mental health issues, accidents, or the use of intoxicants.

Thompson's other defense expert was pathologist Dr. Maxwell Smith, who indicated in an unsworn document that he reviewed only the lung tissue samples taken by Wigren, and observed and opined as follows:

> The predominant pathologic abnormality in this case is that of scattered small vessel thrombi within pulmonary arteries. *This has rarely been reported* in the setting of a fulminant presentation of antiphospholipid antibody syndrome or other systemic clotting disorders. In addition, microthrombi in pulmonary arteries have recently received a significant amount of press due to their presence being identified in patients with advanced and fatal forms of COVID-19[16] infection. In this case, however, there is no associated acute lung injury and the thrombi are only scattered throughout the vasculature, and therefore, *I am not certain the microthrombi are the definitive cause of death.* It would be helpful to know if the patient had any clinical history of antiphospholipid antibody syndrome, other connective tissue disease, or other systemic clotting disorder.

(Emphasis added.) Smith's final diagnoses were "[s]cattered small artery microthrombi" and "[n]o evidence of background acute lung injury or chronic interstitial lung disease." Thompson's January motion also noted reports from third parties that Gates-Jackson "suffered from endocrine issues" and had a "thyroid condition." Gates and the State opposed the motion.

After a hearing, the trial court concluded that Thompson had not shown the reasonableness of the scope of his request or the materiality of the records to his defense and denied the motion. The court determined that he had requested to subpoena medical records that "[fell] into the category of might possibly be helpful" to his defense, which was, according to the court, insufficient to carry his burden.

The trial court did not abuse its discretion in so ruling. The record reflects that although Gates-Jackson had scattered small microthrombi in her lungs,

---

[16] 2019 novel coronavirus infectious disease.

documentation from Thompson's medical experts indicated, at best, a speculative connection between the abnormal medical sign and her death. For instance, Wigren's sworn declaration indicated that this abnormal medical sign "may" have contributed to a natural cause of death and he wished to know if she had other conditions that "*may* relate to her death." (Emphasis added.) Moreover, Smith's consultation report plainly reflected that he was "not certain" that the microthrombi were "the definitive cause of death" and wished to review more records to "know *if* the patient had any clinical history" of other conditions. (Emphasis added.) As a result, neither expert expressly opined that microthrombi caused Gates-Jackson's death or that the microthrombi were a medical sign of a concrete underlying condition that caused her death.

Consequently, Thompson's argument that the medical records he sought to obtain by subpoena in January 2022 were necessary to refine and support his defense experts' conclusions about Gates-Jackson's cause of death amounted to an unsupported assertion that the requested medical records "might" bear such fruit. *See Blackwell*, 120 Wn.2d at 830. Therefore, Thompson did not carry his burden to establish the materiality of the requested records. The trial court properly denied his January motion on that basis.

B. November 2022 Motion

On November 17, 2022, Thompson filed another motion for an SDT for Gates-Jackson's medical records. In that motion, he requested five years of her medical records from a specific endocrine medical center and provided as support an excerpt of a transcript from the court's hearing on his first SDT motion, a copy

of Smith's consultation note described *supra*, and an updated declaration from Wigren. Wigren's declaration reiterated his prior statements regarding pulmonary microthrombi and indicated that, in an interview since the time of Thompson's January motion, Gates had reported that Gates-Jackson had Graves' disease and "had been losing weight." Wigren stated that

> Graves' disease is an immune system disorder that results in the overproduction of thyroid hormones. *Although Graves' disease is usually not life-threatening, it can lead* to heart problems such as irregular heartbeats, which can trigger blood clots, strokes and heart failure.

He further stated that the endocrinology records would "provide a comprehensive and reliable understanding of her death."

After a hearing, the court again denied Thompson's motion. The court ruled that "no material new information was submitted since denial of prior motion" in January 2022 and "the additional information that has been provided does not change the analysis from the prior motion" that "there was not a sufficient showing of particularized materiality."

The trial court again did not abuse its discretion. The court correctly identified that Thompson's November motion did not contain new material information; his January request had already noted the possibility of Gates-Jackson's thyroid condition. Furthermore, neither Wigren's declaration submitted at the time of Thompson's January motion nor Smith's unsworn report referenced a relationship between her alleged thyroid condition and a cause of death. This is notable because only after the court denied his January motion did Thompson submit a declaration from Wigren seeking to connect Gates-Jackson's purported

thyroid condition to her cause of death. This suggests that Thompson was striving for a basis on which to establish the materiality necessary to warrant his records request and is reinforced by Wigren's own admission that a thyroid condition such as Graves' disease "is usually not life-threatening."[17]

Moreover, although Wigren stated that thyroid conditions "can lead" to heart problems, such as "a major cardiovascular event," such statements were, once again, predicated on possibilities and, therefore, insufficient to establish that Gates-Jackson's alleged thyroid condition contributed to her death such that her medical records regarding that condition would be material to Thompson's defense. Thus, the trial court did not err when it determined that Thompon had again failed to carry his burden of establishing materiality. Accordingly, the trial court did not abuse its discretion when it denied both of Thompson's motions that sought the issuance of an SDT.[18]

## II. Trial Court Did Not Err as to Its ER 404(b) Rulings

Thompson next asserts that the trial court abused its discretion when it ruled under ER 404(b) that evidence of his prior plea statement and the timing of his release from incarceration, both offered to show his motive to kill Gates-Jackson, was relevant and not unfairly prejudicial to him. The trial court did not err.

---

[17] Compounding such a suggestion was that two weeks after he filed his November 2022 motion for an SDT, Thompson filed "supplemental information" he claimed indicated that Gates-Jackson had visited a website regarding "Merck Oncology Clinical Trial for lung" and searched a social media website for "sickle cell anemia" but did not include an updated declaration from Wigren in support of that filing.

[18] Given our resolution of this matter, we need not address Thompson's assignment of error to the court's determination that Gates-Jackson's medical records were privileged, which Thompson raised for the first time on appeal.

We review trial court evidentiary rulings under the abuse of discretion standard. *State v. Roberts*, 32 Wn. App. 2d 571, 599, 553 P.3d 1122 (2024), *aff'd*, 5 Wn.3d 222, 572 P.3d 1191 (2025). The party challenging such a ruling carries the burden of establishing an abuse of discretion. *Id.*

ER 404(b) reads, in relevant part, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive." We have recognized that

> [m]otive, for purposes of the admissibility of evidence under ER 404(b), "goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act." [*State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).] Evidence of a hostile relationship between the defendant and the victim has been held admissible in murder trials to show motive. [*See Powell*, 126 Wn.2d at 260; *State v. Hoyer*, 105 Wash. 160, 177 P. 683 (1919).]

*State v. Baker*, 162 Wn. App. 468, 473-74, 259 P.3d 270 (2011) (footnotes omitted); *see also State v. Americk*, 42 Wn.2d 504, 507, 256 P.2d 278 (1953).

When considering the admission of evidence offered pursuant to ER 404(b), a trial court judge is required to engage in a four-step analysis. *State v. Miller*, 33 Wn. App. 2d 560, 563, 562 P.3d 1281, *review denied,* 5 Wn.3d 1037 (2025). The judge must

> "(1) find by a preponderance of the evidence that the misconduct occurred; (2) identify, as a matter of law, the purpose of the evidence; (3) conclude that the evidence is relevant to prove an element of the crime charged; and . . . (4) balance the probative value of the evidence against its prejudicial effect."

*Id.* (alteration in original) (quoting *State v. Williams*, 156 Wn. App. 482, 490, 234 P.3d 1174 (2010)). "The trial court's analysis must be conducted on the record." *Id.*

### A.    Plea Statement and 2013 Assault of Gates-Jackson

Thompson first asserts that the trial court abused its discretion when it ruled that evidence of his admission in his plea statement that he assaulted Gates-Jackson in 2013 was admissible. The court did not err.

As mentioned, the State sought to introduce evidence that Thompson admitted the following in a 2015 statement of defendant on plea of guilty:

> On November 22, 2013 in King County, Washington, I intentionally assaulted my ex-girlfriend Destinie Gates by strangulation when we were in an argument. I also knowingly restrained her movement without her consent and without lawful authority thereby substantially interfering with her liberty, and tried to get her to not report my conduct by threatening to harm her. While we were arguing I took her phone + some cash from her person without her permission. I also tried to get her to not come to testify against me in a letter that I wrote on 2/25/14 in King County, Washington.[19]

The State indicated that it sought to introduce such evidence for the purpose of establishing Thompson's motive to kill Gates-Jackson.

The trial court determined that the State had established by a preponderance of the evidence that the prior act, the conviction for assaulting Gates-Jackson, had occurred and the purpose for which the State offered the evidence was a permissible one. The court further ruled it was relevant to prove

---

[19] Thompson had been convicted at trial of kidnapping in the first degree, assault in the second degree, and robbery in the first degree, all with domestic violence designations. However, that conviction was reversed on appeal, and he later pleaded guilty to assault in the second degree and unlawful imprisonment, each with domestic violence designations, intimidating a witness and theft in the first degree.

Thompson's motive to kill Gates-Jackson. The judge stated, "In domestic violence cases, evidence of prior incidents of assault is admissible as evidence of motive," "evidence of the 2013 assault and the defendant's admission contained in his statement is strong evidence of his motive for the murder," and, "I do not find that . . . the prejudice substantially outweighs the probative value, especially when the jury is properly instructed."

On appeal, Thompson does not challenge the court's analysis as to step one or step two of the ER 404(b) test but, rather, focuses on the third and fourth steps. Therefore, it is undisputed that the trial court did not err in its determinations as to the occurrence of the acts underlying the evidence or the propriety of the purpose for which such evidence was offered.

The trial court did not abuse its discretion when it admitted this other act evidence. Thompson's admission in the statement of defendant on plea of guilty that he had assaulted Gates-Jackson in 2013 and engaged in other criminal conduct toward her around that time, had significant probative value in establishing his motive to kill her. Such evidence reflected that he had a preexisting hostile relationship toward her, which, as mentioned, supports a permissible inference that he was likely to do further violence to her on that basis. *See Baker*, 162 Wn. App. at 473-74. This was highly probative because the State's evidence surrounding Gates-Jackson's death and Thompson's role therein was largely circumstantial and evidence that he was motivated to kill her supported the State's theory that he intended to do so, a central issue in the prosecution of the charged offense.

With regard to the court's weighing of the probative value of the evidence against its potential for unfair prejudice, Thompson correctly argued before the trial court and reiterates on appeal that he was charged with killing Gates-Jackson by strangulation and the reference in the 2015 plea statement to his prior strangulation of her presented a risk of unfair prejudice from the possibility that the jury might draw a negative propensity inference against him. However, the trial court found that the plea statement in question was neither graphic nor extensive and it recognized that the limiting instruction to be given at trial would reduce the potential for unfair prejudice, neither of which were challenged by Thompson at trial or on appeal.[20]

Furthermore, the trial court took additional steps that limited the risk of such prejudice to Thompson: it granted his request to redact the plea statement so that it provided only the admission in question and restricted Gates' testimony regarding the details of the 2013 incident, further minimizing the potential for prejudice. Given the foregoing, the trial court did not err when it ruled that the statements contained in his 2105 guilty plea were admissible under ER 404(b).

B.     Timing of Release from Incarceration in Relation to Gates-Jackson's Death

Thompson next asserts that the trial court abused its discretion when it ruled that evidence of the timing of his incarceration, specifically his release date, relative to Gates-Jackson's death was admissible under ER 404(b). The trial court did not err.

---

[20] The trial court later issued a corresponding limiting instruction to the jury.

- 16 -

In addition to the plea statement analyzed *supra*, the State sought to introduce evidence that Thompson was incarcerated for six years following his convictions in that case and was released in September 2019. The State indicated that it offered such evidence for the purpose of establishing Thompson's motive to kill Gates-Jackson. The court ruled, in pertinent part, as follows:

> 3. The State also seeks to introduce evidence of the fact of the defendant's incarceration following his conviction under Cause No[.] 13-1-13736-1 and his September 2019 release date on that conviction. The [c]ourt finds this prior act occurred by a preponderance of the evidence. The [c]ourt finds that this evidence is offered for an admissible purpose and that the evidence is relevant to prove motive.
>
>   . . . .
>   b. The [c]ourt also finds that evidence of his release date helps explain and provide context for the passage of time between the 2013 assault and the 2020 murder.
>   c. The [c]ourt finds the defendant's release date is relevant because it tends to show that there was not a substantial period of time between the 2013 assault of Ms. Gates-Jackson and her murder that would tend to lessen the probative value of the defendant's motive to kill Ms. Gates-Jackson.
>
> . . . .
> 5. As to evidence of . . . the fact of incarceration, and the defendant's release date, the [c]ourt has weighed the probative value against the prejudicial effect. This evidence is probative of the defendant's motive to kill Ms. Gates-Jackson. The probative value of the evidence outweighs any prejudicial effect.

Thompson again does not challenge the trial court's determination as to the occurrence of the conduct underlying the evidence or the propriety of the purpose for which it was offered. Therefore, as explained *supra*, it is undisputed that the trial court did not err in its determinations as to first or second step of the ER 404(b) analysis. Instead, Thompson again challenges its rulings as to the third and fourth steps of this evidentiary analysis.

The trial court's conclusion regarding the probative value of such evidence in support of Thompson's motive to kill Gates-Jackson was tenable. That after he assaulted her in 2013, he was incarcerated from 2013 to September 2019 and that she died six months later together supported a reasonable inference that his hostility toward her had not dissipated during his term of incarceration. As the court identified, "[D]uring that time, Mr. Thompson was not in a position, because he was incarcerated, to be able to initiate contact with [Gates-Jackson]." This, in turn, supported the State's theory that he was motivated to kill Gates-Jackson as a result of his ongoing hostility against her. Additionally, as recognized by the trial court, Thompson's six-year term of incarceration provided meaningful context for the passage of time between the 2013 assault and Gates-Jackson's death in 2020. This tended to rebut a potential negative inference that Thompson's hostility against Gates-Jackson might have diminished since he assaulted her in 2013.[21]

The trial court's conclusion after weighing the probative value of this evidence against its potential for unfair prejudice was similarly tenable. We note that although Thompson raises arguments in support of potential unfair prejudice on appeal, neither his trial memorandum nor his arguments before the trial court specifically addressed the issue of prejudice, apart from conclusory statements that the jury might draw an unfair propensity inference against him. We do not consider assertions raised for the first time on appeal. RAP 2.5(a). Nevertheless, the probative value of such evidence, analyzed *supra*, plainly outweighs the

---

[21] The court's written order provided another basis on which it determined that the evidence of the timing of his incarceration was relevant as proof of his motive to kill Gates-Jackson. Given our resolution of this matter, however, we need not consider it.

potential for unfair prejudice arising from its admission. Therefore, the trial court did not abuse its discretion when it admitted this evidence under ER 404(b).[22]

### III.    Imposition of LWOP under POAA Not Disproportionate

Thompson next asserts that the trial court's imposition of an LWOP sentence under the POAA was unconstitutional. We disagree.

Thompson first contends that Washington courts have applied the POAA in a racially disproportionate manner against Black defendants, such as Thompson here, in violation of the United States Constitution. His assertion fails to establish an entitlement to appellate relief.

As an initial matter, since 2021, all three divisions of this court have rejected contentions similar to those presented by Thompson in the trial court and on appeal, and when petitions for review were sought with our Supreme Court on this basis, it has repeatedly denied review. *See, e.g.*, *State v. Nelson*, 31 Wn. App. 2d 504, 550 P.3d 529, *review denied*, 3 Wn.3d 1030 (2024); *State v. Webber*, No. 87671-6-I (Wash. Ct. App. Nov. 10, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/876716.pdf, *review denied,* 5 Wn.3d 1044 (2026); *State v. Freeman*, No. 85134-9-I (Wash. Ct. App. May 27, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/851349.pdf, *review denied,* 5 Wn.3d 1018 (2025); *State v. Legrone*, No. 85116-1-I (Wash. Ct. App. Sept. 23, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/851161.pdf, *review denied*, 4 Wn.3d 1008 (2025); *State v. Simmons*, No. 80563-1-I (Wash. Ct. App.

---

[22] We note that the trial court also admitted this evidence for the purpose of rebutting an inference of accident or mistake. Given our resolution of this matter, we need not consider this alternate basis on which the evidence was admitted.

Oct. 25, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/805631.pdf, *review denied*, 199 Wn.2d 1003 (2022); *State v. Kennon*, No. 80813-3-I (Wash. Ct. App. Aug. 16, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/808133.pdf, *review denied*, 198 Wn.2d 1039 (2022).[23] Thompson does not present to us a well-reasoned basis on which to depart from the foregoing decisional authority, and we decline to do so.

Furthermore, Thompson does not establish error with regard to the court's determination that the record before it at the time of sentencing did not allow for meaningful consideration of this complex and nuanced topic. Here, prior to sentencing, Thompson's trial counsel filed a memorandum in support of establishing racial disproportionality in the judicial administration of the POAA. The trial court rejected his argument and found both that the statistical data presented was compiled by an attorney who was not a statistician and no information regarding the attorney's qualifications as a statistician had been presented to the court. The trial court also stated, "The statistics presented by defense do not allow the court to find that the statute is facially racially disparate[:]" "the filters applied, cohort selected, and the analysis presented are all flawed. This data provides the court no legitimate basis for the [c]ourt to analyze whether the statute is racially disparate on its face or as applied." The court further concluded, "[T]he data presented in this case is inadequate as compared to the robust statistical analysis

---

[23] Under GR 14.1(c), we may cite to unpublished opinions as "necessary for a reasoned decision." These unpublished opinions are offered to illustrate the degree to which challenges to the constitutionality of the POAA have been rejected by this court and to provide context for our electing to decline to revisit this topic in light of our Supreme Court's denial of review in those cases where a discretionary review petition was filed.

presented in [*Gregory*] and is more like that presented in *State v. Simmons*[24] where the Court of Appeals found the data inadequate." (Citations omitted.)

The trial court did not err in so reasoning. Thompson's sentencing memorandum does not present adequate evidence on which to reach a determination that the POAA is administered in a racially disproportionate manner. Furthermore, as recognized in this court's prior decisions, *supra*, sentencing courts have no discretion in administering the POAA; if an individual, regardless of their race, obtains a third conviction for a most serious offense, the court must sentence such an individual to LWOP.[25] Thus, his assertion fails.

Next, Thompson avers that "imposing a sentence of death in prison where at least one 'strike' is second-degree assault is categorically unconstitutional." We disagree.

In *State v. Ritchie*, 24 Wn. App. 2d 618, 644-48, 520 P.3d 1105 (2022), we engaged in a step-by-step analysis of the relevant factors applicable to a categorical disproportionality challenge to the POAA where one of the underlying serious offenses was assault in the second degree.[26] There, we expressly and extensively rejected arguments similar to those now raised by Thompson on appeal. *See id.* His briefing does not present persuasive argument or legal

---

[24] *Simmons*, No. 80563-1-I.

[25] As Division Two of this court in *Nelson* stated,

> Like the Supreme Court in [*State v. Jenks*, 197 Wn.2d 708, 487 P.3d 482 (2021)], we have serious concerns about the racially disproportionate impact of the POAA. However, this disproportionate impact likely is due to systemic racial injustice throughout the criminal justice system rather than the administration of the POAA. We are not in a position to address these systemic problems.

*Nelson*, 31 Wn. App. 2d at 517.

[26] *See, State v. Moretti*, 193 Wn.2d 809, 830-34, 446 P.3d 609 (2019) (describing factors).

authority justifying a departure from our decision in *Ritchie*.[27] Thus, we adhere to *Ritchie* and reject Thompson's contention.

Finally, Thompson, in his supplemental brief, relies on the United States Supreme Court's decision in *Erlinger v. United States*, 602 U.S. 821, 838 (2024), in support of the proposition that the POAA sets forth an unconstitutional deprivation of the right to trial by jury. All three divisions of this court have recently, and in some cases repeatedly, rejected such an assertion, and our Supreme Court has denied review when sought on that basis. *State v. Dugan*, ___ Wn. App. 2d ___, 587 P.3d 487, 495-96 (2026); *State v. Hauser*, No. 59608-3-II (Wash. Ct. App. Jan. 27, 2026) (unpublished), https://www.courts.wa.gov/opinions/pdf/ D2%2059608-3-II%20Unpublished%20Opinion.pdf; *State v. Davis*, No. 40181-2-III (Wash. Ct. App. Nov. 6, 2025) (unpublished), https://www.courts.wa.gov/ opinions/pdf/401812_unp.pdf; *State v. Monroe*, No. 85879-3-I (Wash. Ct. App. Aug 25, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/858793.pdf, *review granted on other grounds,* No. 104614-6 (Wash. Feb. 11, 2026); *State v. Beeman*, No. 40172-3-III (Wash. Ct. App. July 29, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/401723_unp.pdf, *review denied*, 5 Wn.3d 1024 (2025); *State v. Rivers*, No. 85314-7-I (Wash. Ct. App. Mar. 10, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/853147.pdf, *review denied*, 4 Wn.3d 1036 (2025); *State v. Herndon*, No. 57049-1-II (Wash. Ct. App. Feb. 13, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057049-1-

---

[27] Thompson asserts that *Ritchie* does not apply to this matter. He is mistaken. In so asserting, he appears to have relied on a scrivener's error in the court's written order which erroneously cited to *State v. Richie*, 126 Wn.2d 388, 894 P.3d 1308 (1995), rather than *State v. Ritchie*, 24 Wn. App. 2d 618, the case that the court correctly identified in its oral ruling.

II%20Unpublished%20Opinion.pdf, *review granted on other grounds,* No. 104571-9 (Wash. Feb. 18, 2026).[28]  Thus, we reject Thompson's assertion on this issue.  Accordingly, Thompson's challenge to the imposition of an LWOP sentence under the POAA fails.

IV.    Statement of Additional Grounds for Review

Thompson submitted a pro se statement of additional grounds for review (SAG) that presents three additional challenges.  However, none of the bases therein establish an entitlement to appellate relief.[29]

    A.    Scope of Review and Challenge to Reliance on No Contact Order

Thompson first claims several errors occurred at trial from reliance on a no contact order (NCO) that he asserts had been vacated prior to the prosecution in this matter.  In support of establishing that the NCO had been vacated, Thompson relies on documents attached to his SAG.  However, these attachments do not constitute evidence properly before us on direct review.

RAP 9.6(a) governs designation of clerk's papers and exhibits.  It states,

> The party seeking review should, within 30 days after the notice of appeal is filed . . . , serve on all other parties and file with the trial court clerk a designation of those clerk's papers and exhibits the party wants the trial court clerk to transmit to the appellate court.

---

[28] As discussed *supra*, under GR 14(c), we cite to these unpublished opinions as "necessary for a reasoned decision," with these unpublished opinions offered to illustrate the degree to which we have rejected reliance on *Erlinger* for the proposition argued by Thompson herein and to provide context for our electing to decline to revisit this topic in light of our Supreme Court's denial of review in those cases where a discretionary review petition was filed.

[29] RAP 10.10(a) provides that a defendant's statement of additional grounds for review may "discuss those matters related to the decision under review *that the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel*."  (Emphasis added.)  Therefore, to the extent that the grounds for relief submitted by Thompson involve matters presented in his counsel's briefing, and addressed *supra*, we decline to repeat our analysis.

RAP 9.6(a). Additionally, RAP 10.10(c) regards the relationship between a pro se SAG and the record designated for review. It states, "Only documents *that are contained in the record on review* should be attached or referred to in the statement." RAP 10.10(c) (emphasis added). Furthermore, RAP 9.10 provides, "The party directed or permitted to supplement the record on review must file . . . a designation of clerk's papers as provided in rule 9.6 . . . within the time set by the appellate court."

The documents attached to Thompson's SAG include purported copies of a 2015 domestic violence NCO, a 2015 felony plea agreement document from his 2015 guilty plea that contains language that vacated a 2014 judgment and sentence, and a 2014 domestic violence NCO. However, those records were either not designated on appeal, not part of an order that directed or permitted supplementation of the record on appeal, or designated on appeal but in a format such that the language on which Thompson relies in his SAG appears to have been redacted at trial and, thus, did not form part of the record designated on appeal. *See* Exhibit 89. Therefore, this challenge centers on evidence outside the scope of his direct appeal and we decline to consider it.[30]

B.      Prosecutorial Misconduct in Closing Argument

Thompson next claims that the prosecutor engaged in misconduct during closing argument. Thompson does not establish error.

As a general matter, we have stated that

---

[30] We also note that "issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a statement of additional grounds." *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013).

- 24 -

[a] defendant claiming prosecutorial misconduct has the burden to prove that the prosecutor's conduct was both improper and prejudicial. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). . . .

When reviewing a prosecutor's statements during closing argument, we view the statements in the context of the entire argument. *Fisher*, 165 Wn.2d at 747. The prosecutor has "wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006) (citing *State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995)), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014).

*State v. Ritchie*, 24 Wn. App. 2d 618, 638-39, 520 P.3d 1105 (2022).

Thompson argues that a statement by the prosecutor violated the trial court's ER 404(b) ruling and unfairly appealed to the passion or prejudice of the jury. Our Supreme Court has recognized,

References to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct. [*State v.*] *Belgarde*, 110 Wn.2d [504,] 507-08[, 755 P.2d 174 (1988)]. If defense counsel failed to request a curative instruction, the court is not required to reverse. *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994).

*Fisher*, 165 Wn.2d at 747. Indeed, "'[d]efense counsel's failure to move for a curative instruction or a mistrial at the time strongly suggests the argument did not appear [irreparably prejudicial] in the context of the trial.'" *Ritchie*, 24 Wn. App. 2d at 643-44. (some alteration in original) (quoting *State v. Negrete*, 72 Wn. App. 62, 67, 63 P.2d 137 (1993)).

Here, the exchange in question was as follows:

[DEPUTY PROSECUTOR]: And then the [d]efendant had the additional incredible misfortune that the King County Medical Examiner's Office concluded that she died of exactly the same mechanism of assault—strangulation—that the [d]efendant inflicted on Destinie in 2013.

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

Thompson's challenge on this issue fails. His trial counsel did not request a curative instruction or move for a mistrial, which suggests that this statement, in the context of the whole trial, was not so prejudicial as to warrant additional relief from the trial court and further suggests that the trial court's ruling that sustained Thompson's objection was sufficient to remedy any potential prejudice. Moreover, the trial court repeatedly instructed the jury that counsels' arguments were not evidence. We presume that a jury follows this instruction. *State v. Warren*, 165 Wn.2d 17, 29, 195 P.3d 940 (2008). Moreover, Thompson does not present persuasive argument or authority to establish that the foregoing statement constituted flagrant misconduct incurable by instruction.

Thompson also challenges other statements made by the prosecutor during closing argument. However, even assuming that those statements constituted misconduct, the trial record reflects that the only defense objection during the State's closing argument was the one analyzed and rejected *supra*.

In such a circumstance, according to our Supreme Court, "[a] defendant's failure to object to a prosecutor's improper remark constitutes a waiver, unless the remark was 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' that could not have been cured by an instruction to the jury." *Gregory*, 158 Wn.2d at 841 (quoting *State v. Stenson*, 132 Wn.2d 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). In support of each of his prosecutorial misconduct challenges, Thompson's SAG only summarizes the alleged statements, recites the foregoing legal standard, and provides a conclusory statement that the standard has been

met.  This is insufficient for him to carry his burden to demonstrate error in order to establish entitlement to relief on appeal.

       C.     Deprivation of Right to Speedy Trial

Next, Thompson avers that he was deprived of his right to a speedy trial when the trial court repeatedly granted requests for continuances over his objection.  His contention on this issue fails.

We have stated that

> "[t]he analysis for speedy trial rights under article I, section 22 [of the Washington Constitution] is substantially the same as the Sixth Amendment analysis."  [*State v.*] *Ollivier*, 178 Wn.2d [813,] 826[, 312 P.3d 1 (2013)] (citing [*State v.*] *Iniguez,* 167 Wn.2d [273,] 289[, 217 P.3d 768 (2009)]).  The United States Supreme Court adopted a balancing test in *Barker* [*v. Wingo*, 407 U.S. 514 (1972)] to analyze alleged speedy trial right violations.  *Iniguez*, 167 Wn.2d at 283 (citing *Barker*, 407 U.S. at 530).  Some delay in bringing a case to trial is both necessary and inevitable.  *Id.*
>     To trigger the balancing analysis, a defendant must first show that the delay "crossed a line from ordinary to presumptively prejudicial."  *Id.* (citing *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992); *Barker*, 407 U.S. at 530).  This inquiry is necessarily fact-dependent and relative; for example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  *Barker*, 407 U.S. at 531.  The Washington Supreme Court has rejected "a formulaic presumption of prejudice upon the passing of a certain period of time" in favor of a fact-specific analysis of the length of delay, complexity of the charges, and reliance on eyewitness testimony.  *Iniguez*, 167 Wn.2d at 292.

*State v. Hatt*, 11 Wn. App. 2d 113, 152-53, 452 P.3d 577 (2019) (some alterations in original).

Here, Thompson was charged in April 2020, arraigned the following month, and his case went to trial nearly three years later, in March 2023.  Despite the complexity of this prosecution for murder in the second degree in the context of a

potential third strike and the imposition of LWOP under the POAA, this delay is sufficient to trigger the *Barker* analysis. Therefore, "[t]o determine whether a defendant's constitutional right to a speedy trial was violated, *Barker* requires that a court consider the '[l]ength of the delay, the reason for the delay, the defendant's assertion of [their] right, and prejudice to the defendant.'" *Id.*at 153 (some alteration in original) (quoting *Barker*, 407 U.S. at 530).

On balance, the *Barker* factors weigh against Thompson; in particular, the first and the second factors weigh heavily against him. We have described them as follows:

> The length of delay once presumptive prejudice has been established is a different assessment than during the threshold phase. *Iniguez*, 167 Wn.2d at 293. In assessing this factor, the Supreme Court has considered the fact that the bulk of the continuances were sought by defense counsel to ensure adequate preparation to be "*an extremely important aspect of the balancing* [*test*]*." Ollivier*, 178 Wn.2d 831. In *Ollivier*, the court concluded that this first factor weighed against the defendant when "the length of delay was reasonably necessary for defense preparation." *Id.*
>
> The second factor that the court considers under *Barker* is the reason for the delay. 407 U.S. at 530. "*When the delay is due to trial preparation needs . . . the first and second factors are closely related*." *Ollivier*, 178 Wn.2d at 831. In assessing this factor, the court evaluates each party's responsibility for the delay and considers each party's blameworthiness and the impact on the defendant's right to a fair trial. *Barker*, 407 U.S. at 531. "Delay caused by defense counsel is chargeable to the defendant." *Ollivier*, 178 Wn.2d at 832.

*Hatt*, 11 Wn. App. 2d at 153-54 (emphasis added) (alterations in original).

Here, between August 2021 and January 2023, 11 motions for a continuance were brought to the trial court and granted. Thompson's defense counsel presented or joined all 11 motions. The basis for the bulk of the continuances requested by Thompson's defense counsel was to ensure the

preparation of adequate defense: to hire and review the analysis of a defense forensic pathologist consultant, interview the State's witnesses, receive rulings from the court on his requests for the issuance of a SDT for Gates-Jackson's medical records to support an alternative theory of her cause of death, review discovery of Gates-Jackson's cell phone and DNA tests of blood found in the Gates-Jackson's car, and obtain the final report of his defense expert prior to trial.

We note, as correctly identified in part by Thompson, that some of the bases for the requests for continuance were due to coordination with other trial appearances, previously scheduled vacations, personal matters, and the State's need for additional time to prepare its case against him. Significantly, however, as undisputed by Thompson, those bases were submitted *in conjunction with* his defense counsel's need for additional trial preparation set out *supra*. He also does not meaningfully dispute, and the record reflects, that the bulk of the length of the delay and the reason for the delay resulted from his defense counsel's preparations for trial. Thus, the first and second *Barker* factors weigh significantly against Thompson.

The third *Barker* factor weighs in his favor. That factor "is the defendant's assertion of [their] right to a speedy trial." *Hatt*, 11 Wn. App. 2d at 154 (citing *Barker*, 407 U.S. at 530). Here, Thompson, in his individual capacity, objected to all but one of the motions on the basis of a deprivation of his right to a speedy trial. Therefore, this factor weighs plainly in his favor.

The fourth *Barker* factor weighs against Thompson. We have explained that the fourth factor

necessitates consideration of the interests of the defendant that the speedy trial right was designed to protect: prevention of oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. [*Barker*, 407 U.S. at 523.] To show that their constitutional right to a speedy trial has been violated, *a defendant ordinarily must establish actual prejudice. Ollivier*, 178 Wn.2d at 840.

*Id.* (emphasis added).

For several reasons, Thompson does not carry his burden to establish actual prejudice. As an initial matter, although many of his objections at trial stated that they were based on a deprivation of his speedy trial right, he did not identify at trial the underlying circumstances that allegedly resulted in such a deprivation but, rather, submitted a conclusory statement that his speedy trial right had been violated. As a result, the record on direct review does not identify those circumstances, and Thompson makes no effort to explain how any of them caused him actual prejudice at trial.[31] Thus, in that regard, his SAG falls short of establishing actual prejudice.

---

[31] In the trial court and again in his SAG, Thompson relied on *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir. 1979), to support one of his objections. His reliance is unavailing. There, the Second Circuit court held that the government had deprived the defendants of their speedy trial right because, although the reasons for the 54-month delay were varied, "the bulk of the delay approximately 31 months was chargeable to the government's inaction, the over-crowded dockets of the Western District of New York, and the trial court's failure to rule expeditiously on appellants' motions." *New Buffalo Amusement Corp.*, 600 F.2d at 377.

Thompson does not present analysis applying any of the bases identified in that decisional authority to the matter before us and, unlike in that case, as explained *supra*, his defense counsel either requested or joined each of the requests for additional time to prepare an adequate defense on his behalf.

His SAG also identifies one of his objections from December 16, 2022 in seeking to rely, for the first time in this case, on this court's decision in *State v. Denton*, 23 Wn. App. 2d 437, 449, 516 P.3d 422 (2022). However, that objection, in its entirety as phrased by one of his defense attorneys, was as follows: "Mr. Thompson has consistently objected to all continuances in this matter so he is—he objects to this continuance as well." Neither his objection at trial nor his reliance on that objection in his SAG provide any analysis of how that decisional authority establishes an entitlement to relief. *See* RAP 10.10(c). Therefore, this aspect of his SAG fails as well.

Next, although his SAG also mentions some specific circumstances that Thompson claims deprived him of his speedy trial right, he again does not carry his burden to establish actual prejudice arising from such circumstances. In his SAG, Thompson states that while he was waiting for his case to go to trial, a defense witness passed away who would have otherwise "provide[ed] information for a proper defense due to the Brother & Sister relationship the Witness had with the decendant [sic]," correctional officers went into his cell and took, destroyed, and scrambled his legal work, an investigator passed away "that had done a ton of witness interviews and was willing to testify on my behalf," his incarceration was "torture, humiliating and unjust," and his "legal work was taken in the middle of [him] trying to draft a motion for a 7.5."

These bases, as alleged, also fall short of establishing actual prejudice. Although these objections specified a circumstance that allegedly deprived him of his speedy trial right, Thompson again does not provide any analysis to demonstrate *how* those circumstances resulted in actual prejudice to his defense at trial. Furthermore, the record on direct review does not contain evidence supporting the existence of the circumstances alleged by Thompson. Although he cites to the verbatim reports of proceeding, the citations are to his own similar statements to the trial court, and the record on appeal does not contain other evidence supporting the occurrence of the alleged circumstances.[32] He thus fails to establish that the fourth *Barker* factor weighs in his favor. Therefore, in light of

---

[32] Once again, "issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a statement of additional grounds." *Calvin*, 176 Wn. App. at 26.

the foregoing analysis, he does not succeed in demonstrating a deprivation of his right to a speedy trial. Accordingly, we conclude that the grounds presented in Thompson's SAG do not establish an entitlement to appellate relief.

Affirmed.

WE CONCUR: